Nos. 25-3231, 25-3344

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,
Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,
Defendants-Appellees,

and

GWICH'IN STEERING COMMITTEE, et al.,
Intervenor-Defendants-Appellants,

and

NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, et al.,
Intervenor-Defendants-Appellants.

On Appeal from the United States District Court for the District of Alaska
Hon. Sharon L. Gleason, No. 3:24-cv-00051-SLG

## APPELLANTS' JOINT OPENING BRIEF

Brook Brisson
Suzanne Bostrom
Bridget Psarianos
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org

*Counsel for Intervenor-Defendants-Appellants Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch*

Karimah Schoenhut
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F Street, NW, 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Counsel for Intervenor-Defendant-Appellant Sierra Club*

Megan R. Condon
Mitchell H. Forbes
NATIVE AMERICAN RIGHTS FUND
745 W. 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: (907) 276-0680
mcondon@narf.org
forbes@narf.org

*Lead Counsel for Intervenor-Defendants-Appellants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

Peter H. Van Tuyn
Karen E. Schmidt
BESSENYEY & VAN TUYN, LLC
911 W. 8th Avenue, Suite 101, PMB 59
Anchorage, AK 99501
Phone: (907) 278-2000
peter@bvt-law.com
karen@bvt-law.com

*Co-Counsel for Intervenor-Defendants-Appellants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States and that no publicly held corporation owns 10% or more of their stocks because they have never issued any stock or other security.

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council state that they are sovereign, federally recognized Tribal governments.

i

TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES ........................................................................... iv

GLOSSARY OF ACRONYMS AND SHORT NAMES.................................... vii

INTRODUCTION ...........................................................................................1

STATEMENT OF JURISDICTION...................................................................4

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ............................5

PERTINENT STATUTES AND REGULATIONS ...............................................6

STATEMENT OF THE CASE............................................................................6

    I.      The Gwich'in People's Connection to the Coastal Plain......................7

    II.     The Coastal Plain's Exceptional Cultural, Wildlife, and Wilderness Values and Decades-Long Protections.....................................................9

    III.   The Tax Act, Leasing Program, and Lease Sale ................................10

    IV.   The President's and Secretary's Actions to Review the Leasing Program and Address the Leases ......................................................13

    V.     The Current Litigation......................................................................17

STANDARD OF REVIEW ..............................................................................18

SUMMARY OF THE ARGUMENT ..................................................................18

ARGUMENT ..................................................................................................20

    I.      Interior Has Inherent Authority to Cancel Leases to Correct the Agency's Pre-Leasing Legal Errors. ..................................................20

II.     Interior's Regulation Does Not Limit the Secretary's Inherent Authority to Cancel Leases to Correct the Agency's Pre-Leasing Legal Errors. ...................................................................................22

CONCLUSION ..............................................................................................31

## TABLE OF AUTHORITIES

**Cases**

*Alaska Indus. Dev. & Exp. Auth. v. Biden*,
  685 F. Supp. 3d 813 (D. Alaska 2023) .................................................12, 13, 14

*Alaska v. Jewell*,
  No. 3:14-cv-00048-SLG, 2015 U.S. Dist. LEXIS 94574 (D. Alaska July 21,
  2015) ....................................................................................................... 6, 10

*Albertson v. FCC*,
  182 F.2d 397 (D.C. Cir. 1950) ........................................................................ 20

*Belville Mining Co. v. United States*,
  999 F.2d 989 (6th Cir. 1993) ........................................................................... 21

*Boesche v. Udall*,
  373 U.S. 472 (1963) ........................................ 19, 20, 21, 25, 26, 27, 28, 29, 30

*Bottinelli v. Salazar*,
  929 F.3d 1196 (9th Cir. 2019) ......................................................................... 18

*Cameron v. United States*,
  252 U.S. 450 (1920) ................................................................................... 21, 30

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ........................................................................................ 22

*Cruz v. Nat'l Steel & Shipbuilding Co.*,
  910 F.3d 1263 (9th Cir. 2018) .................................................................... 21, 29

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) ........................................................................... 14

*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) ........................................................................... 18

*Friends of the Inyo v. U.S. Forest Serv.*,
  103 F.4th 543 (9th Cir. 2024) .......................................................................... 18

*Gray v. Johnson*,
  395 F.2d 533 (10th Cir.) ................................................................................... 27

iv

*Gun S., Inc. v. Brady*,
877 F.2d 858 (11th Cir. 1989) ............................................................ 20

*Gwich'in Steering Comm. v. Bernhardt*,
No. 3:20-cv-00223-SLG, 2021 U.S. Dist. LEXIS 1471 (D. Alaska Jan. 5, 2021)
............................................................................................................. 6, 8

*Hayes v. Chaparral Energy, L.L.C.*,
No. 14-CV-495-GKF-PJC, 2016 U.S. Dist. LEXIS 200382 (N.D. Okla. Mar. 29,
2016) ................................................................................................... 28

*Ivy Sports Med., L.L.C. v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) ............................................................... 20

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................. 18

*Nat'l TPS All. v. Noem*,
150 F.4th 1000 (9th Cir. 2025) ............................................................. 20

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ............................................................... 18

*Sangre De Cristo Dev. Co. v. United States*,
932 F.2d 891 (10th Cir. 1991) ............................................................. 27

*Seven County Infrastructure Coalition. v. Eagle County*,
605 U.S. 168 (2025) ............................................................................. 14

*Silver State Land, L.L.C. v. Schneider*,
843 F.3d 982 (D.C. Cir. 2016) ....................................................... 20, 22

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
555 F. Supp. 3d 739 (D. Alaska 2021) ................................................. 14

*Students for Fair Admis., Inc. v. President & Fellows of Harv. Coll.*,
600 U.S. 181 (2023) ............................................................................... 5

*Trs. for Alaska v. Watt*,
524 F. Supp. 1303 (D. Alaska 1981) ..................................................... 6

*Winkler v. Andrus*,
614 F.2d 707 (10th Cir. 1980) ............................................................. 21

**Statutes**

5 U.S.C. § 706 ................................................................................................ 18

16 U.S.C. § 3142 ........................................................................................ 6, 10

16 U.S.C. § 3143 ........................................................................................... 10

28 U.S.C. § 1291 ............................................................................................. 4

28 U.S.C. § 1331 ............................................................................................. 4

30 U.S.C. § 188 ............................................................................................. 25

42 U.S.C. §§ 6501–6507 ...............................................................................22

43 U.S.C. § 2 ........................................................................................... 20, 30

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487,
94 Stat. 2390 (1980) ................................................................................. 10

Tax Cuts and Jobs Act, Pub. L. No. 115-97,
131 Stat. 2054 (2017) ................................................. 7, 10, 11, 14 15, 21, 23

**Regulations**

43 C.F.R. §§ 3130–3138 ............................................................................... 19

43 C.F.R. § 3136.3 ....................................................... 3, 19, 22, 23, 24

**Other**

Public Land Order 2214: Establishing the Arctic National Wildlife Range,
25 Fed. Reg. 12,598 (Dec. 9, 1960) .............................................................. 10

Oil and Gas Leasing—National Petroleum Reserve-Alaska; Proposed Rulemaking
Authorizing Oil and Gas Leasing in the National Petroleum Reserve-Alaska,
46 Fed. Reg. 37,725 (July 22, 1981) ............................................................ 29

Procedures for Leasing of Oil and Gas in the National Petroleum Reserve; Alaska,
46 Fed. Reg. 55,494 (Nov. 9, 1981) .............................................................. 29

Exec. Order No. 13990: Protecting Public Health and the Environment and
Restoring Science to Tackle the Climate Crisis,
86 Fed. Reg. 7037 (Jan. 25, 2021) ................................................................ 13

FED. R. APP. P. 4 ............................................................................................... 4

## GLOSSARY OF ACRONYMS AND SHORT NAMES

| | |
|---|---|
| AIDEA | Alaska Industrial Development and Export Authority |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| Arctic Refuge | Arctic National Wildlife Refuge |
| Assistant Secretary | Principal Deputy Assistant Secretary of Land and Minerals Management |
| BLM | Bureau of Land Management |
| Cancellation Decision | September 2023 decision cancelling leases |
| Deputy Secretary | Deputy Secretary of the U.S. Department of the Interior |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Executive Order | Executive Order 13990 |
| Interior | U.S. Department of the Interior |
| Leasing Program | Coastal Plain Oil and Gas Leasing Program |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NWRSAA | National Wildlife Refuge System Administration Act |
| Range | Arctic National Wildlife Range |
| Reserve | National Petroleum Reserve-Alaska |
| Reserves Act | Naval Petroleum Reserves Production Act |
| Secretary | Secretary of the U.S. Department of the Interior |
| Tax Act | Tax Cuts and Jobs Act |

vii

INTRODUCTION[1]

This appeal seeks to uphold the U.S. Department of the Interior's (Interior) decision to cancel unlawfully issued oil and gas leases in the Coastal Plain of the Arctic National Wildlife Refuge (Arctic Refuge). Interior cancelled these leases because of serious legal flaws with the underlying Coastal Plain Oil and Gas Leasing Program (Leasing Program). The Secretary of the U.S. Department of the Interior (Secretary) properly relied on her inherent authority to cancel the leases to correct the pre-leasing legal errors. The Court should reverse the district court's ruling that Interior needed to obtain a court order to cancel the leases.

The Coastal Plain of the Arctic Refuge in northeast Alaska is a place like no other. It is the biological heart of one of the largest intact ecosystems on the planet and provides habitat for numerous fish, birds, and wildlife, including caribou and polar bears. Because of the wildlife it supports, the Coastal Plain has sustained Indigenous peoples for countless generations and is the cultural cornerstone of the Gwich'in, Indigenous people of Alaska and Canada. The Coastal Plain is sacred to the Gwich'in because of its importance to the Porcupine Caribou Herd. Its wildlife and wilderness also offer unique recreational and scientific opportunities.

---

[1] Pursuant to Circuit Advisory Committee Note to Ninth Circuit Rule 32-2, Intervenor-Defendant-Appellants Gwich'in Steering Committee, et al. and Native Village of Venetie Tribal Government, et al. file a joint opening brief.

Because of the Coastal Plain's exceptional values, presidential administrations and Congress have protected the Coastal Plain since 1960, including by prohibiting oil and gas leasing and development. This changed in 2017. While Congress did not repeal the Arctic Refuge's conservation and subsistence purposes, a provision of the Tax Cuts and Jobs Act (Tax Act) directed the Secretary to establish a leasing program for the Coastal Plain. Interior adopted the Leasing Program in 2020. Gwich'in Tribes, the Gwich'in Steering Committee, conservation groups, and several states filed lawsuits challenging the Leasing Program. Interior held a lease sale in early January 2021 and issued seven leases to the Plaintiff-Appellee, the Alaska Industrial Development and Export Authority (AIDEA).

Shortly after Interior issued the leases, there was a change in federal administrations. The incoming President directed the Secretary to review the legality of the Leasing Program based on the lawsuits' allegations. The Secretary identified multiple legal problems, including a substantive violation of the Tax Act that also undercut the analysis for the Leasing Program. As a result, the Secretary directed the Bureau of Land Management (BLM) to prepare a supplemental analysis under the National Environmental Policy Act (NEPA) to inform a revised Leasing Program. Interior then suspended the leases and paused all activities under the Leasing Program while it undertook the supplemental analysis.

2

Following a multi-year review that confirmed there were substantial legal errors with the Leasing Program, the Deputy Secretary of the U.S. Department of the Interior (Deputy Secretary) cancelled AIDEA's leases (Cancellation Decision). The Deputy Secretary relied on the Secretary's inherent authority to cancel the invalidly issued leases to address pre-leasing legal errors. The Deputy Secretary determined that lease cancellation was warranted because the legal errors were significant and impacted the leases themselves.

AIDEA challenged the Cancellation Decision in U.S. District Court, raising numerous legal claims. The district court ruled on only one claim. The district court held that a BLM regulation related to the National Petroleum Reserve–Alaska (Reserve) in northwest Alaska — 43 C.F.R. § 3136.3(b) — applied to the Leasing Program based on a reference in the Tax Act to regulations governing the Reserve. That regulation requires a court order to cancel validly issued leases in certain circumstances. The district court concluded that the regulation barred the Secretary from cancelling AIDEA's leases absent a court order. The district court treated the regulation as limiting the Secretary's long-recognized, inherent authority to cancel leases to correct pre-leasing legal errors.

The district court's reasoning is incorrect. Even presuming the regulation generally applies to the Coastal Plain, it does not apply in the context of unlawfully issued leases. It applies to and presumes the existence of a validly issued lease.

3

Neither that regulation nor any other applicable statute strips the Secretary of her inherent authority to administratively cancel leases to correct pre-leasing legal errors. Because the Deputy Secretary properly exercised that authority, this Court should reverse the district court's decision and judgment and reinstate the lease Cancellation Decision.

STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 28 U.S.C. § 1331 because AIDEA's claims arose under federal law and were asserted against the federal government. Am. Compl. at 16–31, *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 1:23-cv-03126-JMC (D. Alaska Jan. 16, 2024), ECF No. 11. This Court has jurisdiction under 28 U.S.C. § 1291 because the Native Village of Venetie Tribal Government, et al. (collectively "the Tribes") and the Gwich'in Steering Committee, et al. (collectively "Gwich'in Steering Committee and conservation groups") appeal a final judgment of the district court. 1-ER-3; *see also* Resps. in Opp'n to Mot. to Dismiss, ECF No. 19.1 & 20.1 (explaining the district court's judgment is final and appealable). This appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B) because judgment was entered on March 26, 2025. The Gwich'in Steering Committee and conservation groups filed their notice of appeal on May 16, 2025, and the Tribes filed their notice of appeal on May 22, 2025. 4-ER-625, 4-ER-620.

4

The Tribes have standing to appeal the district court's decision because the Tribes' and their citizens' significant cultural and subsistence interests in, and connection to, the Coastal Plain are harmed by the reinstatement of AIDEA's unlawful leases. *See, e.g.*, 2-ER-31–45 (declarations describing the Tribes' and their citizens' interest in and connection to the Coastal Plain and impacts of AIDEA's leases on those interests). The Gwich'in Steering Committee and conservation groups have associational standing to appeal the district court's decision because their members' cultural, subsistence, and recreational use of the Coastal Plain and the wildlife that rely on it are harmed by the reinstatement of AIDEA's unlawful leases. *See, e.g.*, 2-ER-31–315; 3-ER-318–373 (declarations describing the organizations' and members' interests and use of the Coastal Plain and its resources and the impacts of AIDEA's leases to those interests).

A favorable decision from this Court reversing the district court's decision and judgment and reinstating the Cancellation Decision will redress these harms to Appellants' interests. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (associational standing test).

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether, under the Tax Act, the Secretary maintains the inherent authority to cancel invalidly issued leases to correct the agency's pre-leasing legal errors with the Coastal Plain Leasing Program.

5

PERTINENT STATUTES AND REGULATIONS

The addendum following this brief contains all applicable statutes and regulations.

STATEMENT OF THE CASE

The Arctic Refuge in northeast Alaska is America's largest and northernmost national wildlife refuge. *Alaska v. Jewell*, No. 3:14-cv-00048-SLG, 2015 U.S. Dist. LEXIS 94574, at *2–3 (D. Alaska July 21, 2015). It encompasses boreal forests and rivers that flow into the mighty Yukon River in the south, the snow-capped peaks and glaciers of the Brooks Range, and a vibrant foothill and tundra Coastal Plain[2] that stretches from the mountains north to the Beaufort Sea. *Gwich'in Steering Comm. v. Bernhardt* (*GSC*), No. 3:20-cv-00204-SLG, 2021 U.S. Dist. LEXIS 1471, at *6 (D. Alaska Jan. 5, 2021); *Trs. for Alaska v. Watt*, 524 F. Supp. 1303, 1305 (D. Alaska 1981), *aff'd*, 690 F.2d 1279 (9th Cir. 1982). The land and the wildlife it supports are vital to Indigenous people of Interior and Arctic Alaska and Canada, and it has exceptional wilderness that supports many uses. Oil and gas activities on the 1.5-million-acre Coastal Plain had been prohibited for decades. *See GSC*, 2021 U.S. Dist. LEXIS 1471, at *8. That changed with the passage of the Tax Act in 2017, in which Congress directed BLM to adopt a

---

[2] The Coastal Plain is sometimes referred to as the "1002 area" after the section of the Alaska National Interest Lands Conservation Act (ANILCA) that governs the area. ANILCA § 1002(b)(1), 16 U.S.C. § 3142(b)(1).

Leasing Program and hold lease sales on the Coastal Plain. *See* Tax Act, Pub. L. 115-97, § 20001(b)(2)(A), 131 Stat. 2054, 2235–37 (2017). BLM adopted a Leasing Program in 2020. However, there were significant legal flaws with the Leasing Program, resulting in the BLM issuing unlawful leases. The Secretary's action to correct the legal errors by cancelling the leases is the subject of this litigation.

## I.   THE GWICH'IN PEOPLE'S CONNECTION TO THE COASTAL PLAIN

The Arctic Refuge lies at the heart of the traditional homelands of the Gwich'in and Iñupiat peoples. The Gwich'in are Indigenous people of Alaska and Canada whose homelands have largely traced the migratory path of the Porcupine Caribou Herd. 3-ER-406, 3-ER-417, 3-ER-324 (map).[3] The Gwich'in live a subsistence way of life, which is sustained by the annual migration of wildlife that depend on the Coastal Plain. 2-ER-32 ¶ 9; 3-ER-605, 3-ER-607–09, 3-ER-407.

---

[3] The Gwich'in now live in communities in Alaska and the Yukon and Northwest Territories, Canada. 3-ER-406; 3-ER-324 (map). They are represented by Tribal and First Nations governments. Appellants here include three Gwich'in Tribal governments — the Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council — as well as the Gwich'in Steering Committee. Appellants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council are the sovereign governments for the Neets'ạįį Gwich'in, who live in the villages of Vashraįį K'ǫǫ (Arctic Village) and Vįįhtaįį (Venetie), Alaska. Appellant Gwich'in Steering Committee was organized in 1988 at the direction of the Chiefs and Elders from all of the Gwich'in Tribes and First Nations to be the united voice for the Gwich'in people on matters related to oil and gas in the Arctic Refuge. 3-ER-327. The Gwich'in are united in their dedication to protect the Coastal Plain.

The Gwich'in in modern times view the Coastal Plain as a sanctuary where animals return to renew their life cycles. 2-ER-36 ¶ 8; 3-ER-603, 3-ER-407.

The Gwich'in are caribou people. The caribou that calve within the Coastal Plain are the primary source of Gwich'in subsistence harvests in both Alaska and Canada. 2-ER-34 ¶ 3, 2-ER-36 ¶ 9; 3-ER-605–09, 3-ER-407–10, 3-ER-411–13. These caribou are more than a food source for the Gwich'in; their culture revolves around the caribou, and the cultural identity of the Gwich'in people as caribou people is intertwined with the Porcupine Caribou Herd's calving grounds in the Coastal Plain. 2-ER-42 ¶ 7; 3-ER-603, 3-ER-604, 3-ER-413. The Coastal Plain is sacred land to the Gwich'in because of its importance to the Porcupine Caribou Herd. 3-ER-604, 3-ER-414. In fact, the Gwich'in call the Coastal Plain "Iizhik Gwats'an Gwandaii Goodlit" — which translates to "the Sacred Place Where Life Begins" — because of the importance of the Coastal Plain as the calving grounds for the Porcupine Caribou Herd. 2-ER-34 ¶ 3; 3-ER-603, 3-ER-407; *see also GSC*, 2021 U.S. Dist. LEXIS 1471, at *6.

Gwich'in traditional Indigenous knowledge instructs that caribou will be harmed by oil and gas development on the Coastal Plain. 3-ER-604, 3-ER-610, 3-ER-405. For this reason, the Gwich'in came together in 1988 and adopted a resolution calling for the permanent protection of the Coastal Plain. 3-ER-343. This resolution, titled Gwich'in Niintsyaa, has been reaffirmed every two years at a

formal Gwich'in Gathering. 3-ER-343–44. The Gwich'in have worked for decades to protect the Coastal Plain — and the wildlife that rely on it — from the harmful impacts of oil and gas development. 2-ER-34 ¶ 3; 3-ER-343–44.

## II. THE COASTAL PLAIN'S EXCEPTIONAL CULTURAL, WILDLIFE, AND WILDERNESS VALUES AND DECADES-LONG PROTECTIONS

The Coastal Plain provides important habitat for wildlife, including caribou, polar bears, and many species of birds. 3-ER-578–88, 3-ER-589–94, 3-ER-595–602; *GSC*, 2021 U.S. Dist. LEXIS 1471, at *6. The Porcupine Caribou Herd relies on the Coastal Plain for calving, post-calving, insect relief habitat, and high-quality food away from predators. 3-ER-591– 93, 3-ER-598–600. The majority of the Coastal Plain is also designated critical habitat for polar bears under the Endangered Species Act (ESA) because the rivers and hills create unique areas of deep snow drifts ideal for maternal denning and the birthing and rearing of cubs. 3-ER-599–602, 3-ER-401–04. In summer, the abundant plants and insects provide nesting and foraging habitat for copious bird species, which use the Coastal Plain during annual migrations around the globe. 3-ER-578–88, 3-ER-385–96. The Arctic Refuge's wilderness is incomparable and offers unique scientific and recreational opportunities. 3-ER-611, 3-ER-415.

Because of these values, the Coastal Plain was first federally protected in 1960 by the Eisenhower administration as the Arctic National Wildlife Range (Range) "[f]or the purpose of preserving unique wildlife, wilderness and

9

recreational values." Public Land Order 2214: *Establishing the Arctic National Wildlife Range*, 25 Fed. Reg. 12598 (Dec. 9, 1960); 3-ER-611. When Congress passed the Alaska National Interest Lands Conservation Act (ANILCA) in 1980, it redesignated the Range as the Arctic Refuge, expanded it south and west, and recognized four additional purposes. ANILCA, Pub. L. No. 96-487, § 303(2), 94 Stat. 2371, 2390 (1980). Those four purposes are: "to conserve fish and wildlife populations and habitats in their natural diversity," "to fulfill the international treaty obligations . . . with respect to fish and wildlife and their habitats," "to provide . . . for continued subsistence uses," and "to ensure . . . water quality and necessary water quantity." *Id.* § 303(2)(B). Other than authorizing a one-time exploration program that expired long ago, ANILCA prohibited oil and gas activities on the Coastal Plain. 16 U.S.C. §§ 3142(a)–(h), 3143; *Jewell*, 2015 U.S. Dist. LEXIS 94574, at *23. For decades, oil and gas activities remained prohibited.

### III. THE TAX ACT, LEASING PROGRAM, AND LEASE SALE

Congress changed that longstanding prohibition when it enacted the Tax Act in 2017. A provision of the Tax Act directed the Secretary to adopt an oil and gas leasing program for the Coastal Plain. Tax Act§ 20001(b)(2)(A). While leaving intact the existing conservation and subsistence purposes of the Arctic Refuge and not waiving any other applicable laws, Congress added an additional purpose for the Coastal Plain: "to provide for an oil and gas program." *Id.* § 20001(b)(2)(B). It

called for two lease sales — the first to be held by the end of 2021 and the second by the end of 2024. *Id.* § 20001(c)(1)(A), (c)(1)(B)(ii). It also limited surface development to a maximum of 2,000 acres. *Id.* § 20001(c)(3). The Tax Act directed that the Secretary "shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) [Reserves Act] (including regulations)." *Id.* § 20001(b)(3).

Soon after Congress enacted the Tax Act, BLM began to develop a Leasing Program. The Gwich'in participated extensively in the agency's processes by submitting comments and testifying at hearings. 2-ER-41–42 ¶¶ 5–6; 3-ER-329 ¶ 26; 2-ER-35, 38 ¶¶ 4, 13. Additionally, the Tribes were cooperating agencies in the NEPA environmental review process and consulting parties in the National Historic Preservation Act (NHPA) Section 106 process, which requires federal agencies to consider impacts on historic properties, including Traditional Cultural Places. 2-ER-41–42, 44 ¶¶ 5–6, 13; 2-ER-35, 38 ¶¶ 4, 13. The Tribes engage with the federal government on a nation-to-nation basis to advocate for the protection of the Coastal Plain and their citizens' way of life. 2-ER-41, 44 ¶¶ 5, 13; 2-ER-35, 38 ¶¶ 4, 13.

Interior finalized the original Leasing Program in August 2020 after completing a public process and issuing an environmental impact statement (EIS)

11

and record of decision pursuant to NEPA. *See generally* 3-ER-489–576; *Alaska Indus. Dev. & Exp. Auth. v. Biden* (*AIDEA*), 685 F. Supp. 3d 813, 825 (D. Alaska 2023). The Tribes challenged the Leasing Program, alleging violations of ANILCA, the National Wildlife Refuge System Administration Act (NWRSAA), the Tax Act, the NHPA, NEPA, and the Administrative Procedure Act (APA). Compl. for Declaratory and Injunctive Relief, *Native Vill. of Venetie Tribal Gov't v. Bernhardt*, No. 3:20-cv-00223-SLG (D. Alaska Sept. 9, 2020), ECF No. 1. The Gwich'in Steering Committee and conservation groups also challenged the Leasing Program, alleging violations of ANILCA, NEPA, the Tax Act, the NWRSAA, the Wilderness Act, the ESA, and the APA. *See generally* First Am. Compl., *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204-SLG (D. Alaska Nov. 2, 2020), ECF No. 19.[4] Both lawsuits include claims that Interior unlawfully interpreted the Tax Act's 2,000-acre limitation on surface development and, due to that error and others, failed to consider less harmful alternatives, in violation of NEPA's requirement to consider a reasonable range of alternatives. *Id.* at 61–62, 67–68; Compl. at 68–69, 72–74, *Native Vill. of Venetie*, No. 3:20-cv-00223-SLG. Both lawsuits also include claims that the Leasing Program failed to protect the conservation and subsistence purposes of the Arctic Refuge. First Am. Compl. at

---

[4] There are two additional lawsuits challenging the Leasing Program. *Nat'l Audubon Soc'y v. Bureau of Land Mgmt.*, No. 3:20-cv-00205-SLG (D. Alaska); *State of Wash. v. U.S. Dep't of Interior*, No. 3:20-cv-00224-SLG (D. Alaska).

12

58–61, *Gwich'in Steering Comm.*, No. 3:20-cv-00204-SLG; Compl. at 59–62,

*Native Vill. of Venetie*, No. 3:20-cv-00223-SLG.

BLM held the first lease sale in early January 2021. 3-ER-487–88; *AIDEA*,

685 F. Supp. 3d at 825. It offered twenty-two tracts for lease, received bids on

eleven, and ultimately issued nine leases. 3-ER-484–86, 3-ER-454–83, 3-ER-439–

40, 3-ER-448–453, 3-ER-441–47. AIDEA obtained seven leases; two other

companies each obtained one lease. 3-ER-484–86, 3-ER-454–83, 3-ER-448–53, 3-

ER-441–47; *AIDEA*, 685 F. Supp. 3d at 825–26.[5]

## IV. THE PRESIDENT'S AND SECRETARY'S ACTIONS TO REVIEW THE LEASING PROGRAM AND ADDRESS THE LEASES

After taking office, President Biden issued Executive Order 13990

(Executive Order), noting the "alleged legal deficiencies" of the Leasing Program.

Exec. Order No. 13990, 86 Fed. Reg. 7037, 7039 (Jan. 25, 2021); 3-ER-438. The

Executive Order indicated that the Secretary should pause activities implementing

the Leasing Program, review the program, and conduct a new analysis of the

Leasing Program as needed. 3-ER-438.

The Secretary reviewed the Leasing Program and identified multiple legal

errors, including the agency's failure to properly interpret and apply the Tax Act's

2,000-acre limitation on surface development and its related failure to analyze a

---

[5] Those two companies later relinquished their leases. 3-ER-428–32, 3-ER-422–427; *AIDEA*, 685 F. Supp. 3d at 845 n.188.

reasonable range of alternatives. 3-ER-433–34. The Secretary directed Interior to undertake a supplemental analysis of the Leasing Program's impacts and address the legal deficiencies. 3-ER-433. She also imposed a temporary halt on "all Department activities related to the [Leasing] Program" until the completion of the supplemental analysis. 3-ER-433; *see also* 3-ER-434 (directing that the agencies "shall not take any action to authorize any aspect of the [Leasing] Program").

The Principal Deputy Assistant Secretary of Land and Minerals Management (Assistant Secretary) then suspended the leases. 3-ER-435–36.[6] The Assistant Secretary reiterated and further explained the legal deficiencies with the Leasing Program and identified that there may be additional legal failings. 3-ER-435–36.[7] The lease suspension letter stated that the supplemental NEPA analysis

---

[6] AIDEA, along with other plaintiffs, challenged the Executive Order, the Secretary's secretarial order, and the Assistant Secretary's lease suspension orders. The district court rejected AIDEA's claims and upheld all the executive actions, concluding that it was within Interior's authority "to pause lease implementation to address legal errors." *AIDEA*, 685 F. Supp. 3d at 855.

[7] In a later addendum to the lease suspension letters, the Assistant Secretary confirmed that BLM's greenhouse gas analysis violated NEPA. 3-ER-420. This Court and the Alaska district court had recently held that similar greenhouse gas analyses were invalid and vacated the agency actions that relied on those analyses. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 738–40, 751 (9th Cir. 2020); *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 762–67, 804–05 (D. Alaska 2021). The U.S. Supreme Court subsequently addressed greenhouse gas assessments in NEPA analyses in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). Regardless of whether the Supreme Court's *Seven County* decision impacts what might have been required for the greenhouse gas analysis for the Leasing Program, the improper interpretation of the Tax Act's 2,000-acre limitation and the NEPA alternatives

would "determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures." 3-ER-435–36; *see also* 3-ER-420–21 (addendum letter explaining the same).

In September 2023, the Deputy Secretary issued the Cancellation Decision. 3-ER-376–82. In his decision cancelling AIDEA's leases, the Deputy Secretary recognized the Secretary's long-recognized, inherent authority to cancel invalidly issued leases to correct pre-leasing legal errors committed by the agency. 3-ER-378, 3-ER-382. The Deputy Secretary explained that Interior "determined that the leases were improperly issued due to pre-leasing legal defects." 3-ER-376; *see also* 3-ER-382. He explained that his decision to cancel AIDEA's leases was based on Interior's findings regarding the agency's unlawful interpretation of the Tax Act's 2,000-acre limitation on surface disturbance and the resulting flawed NEPA alternatives analysis. 3-ER-379–80.

The Deputy Secretary explained that BLM had failed to properly interpret the language in the Tax Act limiting surface development to 2,000 acres. 3-ER-379. That language states that "the Secretary shall authorize up to 2,000 surface acres" for infrastructure and development. Tax Act § 20001(c)(3). BLM had interpreted this provision to mean that it could not authorize less than 2,000 acres

_____

violation each provided an independent and adequate basis for cancellation. 3-ER-379–80.

15

of oil- and gas-related surface disturbance. 3-ER-379. The Deputy Secretary explained why the plain language of the Tax Act allowed BLM to authorize less than 2,000 acres of surface development. 3-ER-379. The Deputy Secretary then explained that this legal error was consequential because the purposes of the Arctic Refuge include protecting wildlife and subsistence. 3-ER-380. The Deputy Secretary also noted the importance of evaluating a reasonable range of alternatives to meet NEPA's mandates and explained that the improper interpretation of the Tax Act unlawfully constrained the alternatives evaluated because all the alternatives required the agency to authorize no less than 2,000 acres of surface development. 3-ER-379–80. The Deputy Secretary found that the legal errors with the Leasing Program "were sufficiently serious and fundamental to the decision-making process" to warrant cancellation. 3-ER-381.

He then explained that information developed while preparing the draft supplemental EIS supported cancelling the leases at that time. 3-ER-381. The Deputy Secretary identified that cancelling the leases before finalizing the revised Leasing Program would allow the agency to consider what areas to offer for lease in the second lease sale, including areas that AIDEA had leased under the unlawful program. 3-ER-381. He additionally recognized the benefit to all parties of cancelling the leases promptly. 3-ER-381. The Deputy Secretary then found that there would be little to no disruptive consequences to AIDEA from cancellation. 3-

16

ER-381–82. The Deputy Secretary based that conclusion on the short time since issuance of the leases, BLM's suspension of the leases for nearly the entire time, and the lack of issuance of any permits for activities. 3-ER-381–82. Interior also refunded AIDEA's bid monies and first-year rentals. 3-ER-374–75.

## V. THE CURRENT LITIGATION

AIDEA then filed this lawsuit, seeking to invalidate the Cancellation Decision. The Tribes and the Gwich'in Steering Committee and conservation groups intervened as defendants. 1-ER-4–5. AIDEA moved for summary judgment. 1-ER-4. Federal Defendants and Intervenor-Defendants opposed and filed cross-motions. 1-ER-4–5. On March 25, 2025, the district court granted AIDEA's motion for summary judgment on only one claim: Count IV, asserting that the Secretary was required by regulation to obtain a court order to cancel AIDEA's leases. 1-ER-14. The district court did not decide AIDEA's remaining claims, finding that Count IV was "independently sufficient" to resolve the case and dismissing one claim as moot. 1-ER-14, 24–25; *see also* 2-ER-29–30. The district court entered its judgment the following day. 1-ER-3.

Both groups of Intervenor-Defendants timely filed appeals. Interior did not appeal. Instead, Interior filed a motion to dismiss the appeals, which this Court denied without prejudice. Order, ECF No. 24.1.

17

## STANDARD OF REVIEW

This Court "review[s] the district court's summary judgment de novo, applying the same standards that applied in the district court." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

Challenges to agency decisions are reviewed under the APA. 5 U.S.C. § 706(2). Pursuant to the APA, a court may "disturb an agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (quotation omitted); 5 U.S.C. § 706(2). Interpretation of a statute or regulation is a question of law to be decided by the court. *Loper Bright Enters. v. Raimondo*, 603 U.S 369, 393–96, 412–13 (2024). In doing so, courts are "guided by the fundamental canons of statutory construction and begin with the statutory text." *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019) (quotation omitted); *see also Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 553 (9th Cir. 2024) (explaining courts interpret a regulation using the same principles as when interpreting a statute).

## SUMMARY OF THE ARGUMENT

The Deputy Secretary's decision to cancel AIDEA's leases is consistent with the Secretary's long-recognized authority to correct pre-leasing legal errors made by the agency, including by administratively cancelling improperly issued leases.

The Supreme Court recognized this authority decades ago in *Boesche v. Udall*, 373 U.S. 472 (1963). The district court erred in holding that Interior's regulation relating to the Reserve at 43 C.F.R. § 3136.3 required the Secretary to obtain a court order to cancel leases to correct the agency's pre-leasing legal errors with the Leasing Program. That regulation requires the Secretary to obtain a court order to cancel leases in certain circumstances. But even if this regulation applies to the Leasing Program by virtue of the Tax Act's reference to the Reserves Act's regulations,[8] it applies only to validly issued leases and is intended to address post-lease issuance events. The regulation does not limit the Secretary's inherent authority to cancel improperly issued leases to correct pre-leasing legal errors. The *Boesche* decision reinforces this. As a result, Congress would not have understood that it was withdrawing the Secretary's inherent authority to correct pre-leasing legal errors by referring generally to the Reserves Act's regulations in the Tax Act.

---

[8] The Tax Act states that BLM shall manage the Leasing Program "in a manner similar to the administration of lease sales" under the Reserves Act and regulations. Some subparts of those regulations directly regulate lease sales and leasing, while other subparts address post-leasing topics such as transfers, extensions, relinquishments, unitization, and storage. *Compare* 43 C.F.R. subpts. 3130–3132, *with* 43 C.F.R. subpts. 3135–3138. As Interior explained, not all of these regulations necessarily address "the administration of lease sales." Defs.' Mem. on Mots. for Summ. J. at 36–37, *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 3:24-cv-00051-SLG (D. Alaska June 7, 2024), ECF No. 52. While the district court determined that the cancellation regulation was related to the administration of lease sales, 1-ER-18–19, this Court need not decide this issue. That is because, even assuming the cancellation regulation generally applies to the Leasing Program, it does not apply in this case because the Deputy Secretary was exercising his inherent authority to cancel invalidly issued leases and that authority has not been withdrawn by Congress.

19

Because the Deputy Secretary cancelled the leases to correct the agency's pre-leasing legal errors, and because Congress has not withdrawn this inherent authority, the Secretary was not obligated to obtain a court order to cancel the improperly issued leases. This Court should reverse the district court's order and judgment and reinstate the Cancellation Decision.

## ARGUMENT

**I.   INTERIOR HAS INHERENT AUTHORITY TO CANCEL LEASES TO CORRECT THE AGENCY'S PRE-LEASING LEGAL ERRORS.**

The Secretary can cancel improperly issued oil and gas leases to correct the agency's pre-leasing legal errors. This authority stems from Congress' broad delegation of authority to administer public lands. 43 U.S.C. § 2. Decades ago, the Supreme Court recognized that Interior's "general powers of management over the public lands" included the power to correct its own legal errors by cancelling leases. *Boesche v. Udall*, 373 U.S. 472, 476 (1963).; *see also Silver State Land, LLC v. Schneider*, 843 F.3d 982, 990–91 (D.C. Cir. 2016) (recognizing the Secretary's authority to cancel patents that were improperly issued).[9] This

---

[9] Relatedly, courts recognize that the "power to reconsider is inherent in the power to decide," and that agencies have inherent authority to reconsider their decisions and address legal errors where Congress has not foreclosed or set out specific procedures for the agency to follow to fix its mistakes. *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (quoting *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)); *see also Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1019–21 (9th Cir. 2025) (discussing cases illustrating the rule that, unless Congress has set out requirements for how an agency reconsiders its decisions, agencies have

20

authority exists even when it is not expressly codified in statute. *Cameron v. United States*, 252 U.S. 450, 460–61 (1920); *Boesche*, 373 U.S. at 477. As the Supreme Court explained, this authority exists unless it has been withdrawn by statute. *Boesche*, 373 U.S. at 478; *see also Winkler v. Andrus*, 614 F.2d 707, 711 (10th Cir. 1980) (recognizing authority to cancel leases to address pre-leasing agency errors and discussing whether the Mineral Leasing Act had limited that authority).

It is against the backdrop of this well-established legal framework that Congress was legislating when it enacted the Tax Act. *See Cruz v. Nat'l Steel & Shipbuilding Co.*, 910 F.3d 1263, 1269 (9th Cir. 2018) (holding Congress is presumed to know the law, including judicial precedents, when it enacts statutes). Nothing in the Tax Act expressly limits the Secretary's inherent authority to cancel improperly issued leases based on pre-leasing legal errors. *See generally* Tax Act, Pub. L. 115-97, § 20001, 131 Stat. 2054, 2235–37 (2017). While the Tax Act says the Secretary should manage the Leasing Program "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act . . . and its regulations," *id.* § 20001(b)(3), nothing in the Reserves Act expressly

---

inherent authority to do so); *Gun S., Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (recognizing general rule that agencies possess implied authority "to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration"); *Belville Mining Co. v. United States*, 999 F.2d 989, 997 (6th Cir. 1993) (discussing agency's inherent authority to reconsider decisions where there are legal deficiencies).

limits the Secretary's inherent authority to cancel improperly issued leases based on pre-leasing legal errors. *See generally* 42 U.S.C. §§ 6501–6507. That is, nothing in the plain language of either of these statutes demonstrates that Congress intended to withdraw the Secretary's inherent authority to cancel leases to address legal errors with the Leasing Program. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."); *see also Silver State Land*, 843 F.3d at 986 (explaining that Congress can limit the Secretary's plenary authority to manage public lands with specific language).

## II. INTERIOR'S REGULATION DOES NOT LIMIT THE SECRETARY'S INHERENT AUTHORITY TO CANCEL LEASES TO CORRECT THE AGENCY'S PRE-LEASING LEGAL ERRORS.

Interior's regulation at 43 C.F.R. § 3136.3 does not limit the Secretary's inherent authority to cancel leases to correct pre-leasing legal errors by the agency. The plain language of the regulation and Supreme Court case law demonstrate that the regulation leaves the Secretary's authority to correct pre-leasing legal errors intact. It follows that Congress did not withdraw the Secretary's inherent authority

22

when it referred to the Reserves Act regulations in the Tax Act. *Contra* 1-ER-20–22.[10]

The Tax Act states that "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." Tax Act, § 20001(b)(3). The Reserves Act regulation at issue provides:

> § 3136.3 Cancellation of leases.
>
> (a) Any nonproducing lease may be cancelled by the authorized officer whenever the lessee fails to comply with any provisions of the Acts cited in § 3130.0-3 of this title, of the regulations issued

---

[10] The district court also found that AIDEA's leases are "known to contain valuable deposits of oil or gas" for the purposes of finding 43 C.F.R. § 3136.3(b) applicable. 1-ER-17. The Court does not need to address the meaning of this phrase or decide whether, as a factual matter, the Coastal Plain contains known valuable deposits of oil and gas. This is because, as a matter of law, the regulation does not apply to invalidly issued leases. *See also* Defs.' Mem. on Mots. for Summ. J., at 37 n.13, *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 3:24-cv-00051-SLG (D. Alaska June 7, 2024), ECF No. 52. Regardless, the district court's finding is questionable because the record is not conclusive. Indeed, the statements cited by the district court explain that the petroleum resources are only "estimates," not known deposits within the meaning of the regulation. 1-ER-17, nn. 59–60; *see also* 3-ER-384 (draft supplemental EIS stating "[g]iven the limited amount of information regarding petroleum resources in the program area, the locations, size, number, and characteristics of any economically viable accumulations of oil are unknown"), 4-ER-615 & 3-ER-419 (footnote omitted) (final EIS and draft supplemental EIS development scenarios stating "[v]ery little oil and gas exploration has occurred in this area, and there are no proven plays at this point"), 3-ER-511 (BLM explaining it decided to lease the entire Coastal Plain because "limited geophysical information" is available to determine where future oil and gas prospects would be located), 4-ER-619 (1998 oil and gas resource assessment stating the Coastal Plain is "without known petroleum accumulations"), 4-ER-617 (2005 economic assessment explaining that there had been no update to the 1998 oil and gas resource assessment).

thereunder or of the leases, if such failure to comply continues for 30-days after a notice thereof has been delivered by registered or certified mail to the lease owner's record post office address.

(b) Producing leases or leases known to contain valuable deposits of oil or gas may be canceled only by court order.

The regulation's plain language relates to the cancellation of leases in the post-leasing context, addressing situations where a lessee fails to comply with its legal obligations. By its terms, the regulation presumes that there are validly issued leases to be cancelled. Subsection (a) addresses instances when the lessee is out of compliance with a legal requirement or lease term, which can only occur after a lease is issued and when the error is not the fault of the agency. *Id.* § 3136.3(a). Subsection (b) addresses "producing leases" and "leases known to contain valuable deposits of oil or gas" — two circumstances that also apply to validly issued leases. *Id.* § 3136.3(b). The regulation is also nested in the subpart of the regulations addressing post-leasing matters — including relinquishments, extensions, suspensions, and unitization — not in the subparts directly related to the administration of lease sales and lease issuance. *See supra* note 8. Reading these provisions together and in context, this subsection should be interpreted to apply to post-lease events that warrant cancellation of validly issued leases. Because AIDEA's leases were invalid from their inception, this regulation does not apply and does not limit the Secretary's inherent authority.

24

This interpretation is consistent with and supported by the Supreme Court's decision in *Boesche v. Udall*, which examined statutory language similar to that in the Reserves Act regulation. In that case, the lessee challenged Interior's cancellation of its Mineral Leasing Act lease, which was based on Interior's failure to comply with a regulation governing non-competitive leases at the time of lease issuance. 373 U.S. at 473–74. At issue was a provision of the Mineral Leasing Act stating that leases can only be cancelled (1) by a court if the lessee fails to comply with the Mineral Leasing Act, its implementing regulations, or the lease, or (2) administratively if the lessee fails to comply with the lease and the leased area is not known to contain valuable oil and gas deposits. *Id*. at 475–76. That provision specifically stated:

> Except as otherwise herein provided, any lease issued under the provisions of . . . [this Act] may be forfeited and canceled by an appropriate proceeding in the United States district court for the district in which the property, or some part thereof, is located whenever the lessee fails to comply with any of the provisions of . . . [the Act], of the lease, or of the general regulations promulgated under . . . [the Act] and in force at the date of the lease . . . .
>
> Any lease issued after August 21, 1935, under the provisions of . . . [§ 17 of the Act, 30 U. S. C. § 226] shall be subject to cancellation by the Secretary of the Interior after thirty days' notice upon the failure of the lessee to comply with any of the provisions of the lease, unless or until the land covered by any such lease is known to contain valuable deposits of oil or gas.

*Id*. at 475 (alterations in original) (quoting 30 U.S.C. § 188).

Boesche argued that, under that provision, the lease could only be cancelled by a court. *Id*. at 475–76. The Secretary asserted that the provision only applied to

25

post-issuance events, whereas cancelling a lease due to pre-leasing defects is based on the Secretary's broad management authority over public lands and inherent authority to correct the agency's own pre-leasing legal errors. *Id*. at 476. According to the Secretary, this provision of the Mineral Leasing Act did not withdraw this authority. *Id.*

In rejecting Boesche's arguments, the Court stated that, "[s]ince the Secretary's connection with the land continues to subsist, [they] should have the power, in a proper case, to correct [their] own errors." *Id.* at 478. The Court held that "the Secretary, under [their] general powers of management over the public lands, had authority to cancel this lease administratively for invalidity at its inception, unless such authority was withdrawn by the Mineral Leasing Act." *Id*. at 476. The Court then considered whether the Mineral Leasing Act provision covering lease cancellation withdrew that authority. The Court concluded that it did not based on the provision's plain language and legislative history showing it "reaches only cancellations based on post-lease events and leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors." *Id*. at 478–79. The Court explained that the language of the provision addressing lease cancellation by court order "clearly assumes the existence of a valid lease." *Id*. at 479. The Court explained that the provision does not apply to leases that were unlawfully issued because a lease "has not been issued at the time

26

the breach of the Act or the regulations occurs, for there is at that time no lease to cancel." *Id.*

*Boesche* instructs that the same outcome is warranted in this case. Here, at the time the legal errors occurred, *i.e.*, during the NEPA process and the adoption of the Leasing Program, AIDEA had not yet received the leases. The leases AIDEA later received were legally defective. Because the language of the regulation presumes the existence of a valid lease, like the Mineral Leasing Act provision at issue in *Boesche*, the regulation does not apply when the Secretary cancels leases to address pre-leasing legal errors. *See Boesche*, 373 U.S. at 481–82 (explaining that it was an unreasonable interpretation of the Mineral Leasing Act to conclude that Congress gave the Secretary the power to cancel leases for post-lease sale events "but implicitly denied him that power in respect of pre-issuance occurrences").

Interpreting the regulation otherwise, as the district court did, would result in the lessee having something akin to a property right in an invalidly issued lease. 1-ER-21–22. This is contrary to law. Courts have held that invalidly issued leases do not confer property rights. *See, e.g.*, *Sangre De Cristo Dev. Co. v. United States*, 932 F.2d 891, 894–95 (10th Cir. 1991) (holding no property interest in an invalidly issued lease); *Gray v. Johnson*, 395 F.2d 533, 537 (10th Cir. 1968), *cert. denied*, 392 U.S. 906 (1968) (holding lease issued contrary to regulations did not vest a

27

property interest); *Hayes v. Chaparral Energy, LLC*, No. 14-CV-495-GKF-PJC, 2016 U.S. Dist. LEXIS 200382, at *15, 36 (N.D. Okla. Mar. 29, 2016) (holding oil and gas leases and permits invalid for NEPA violations and concluding no property interests). Because AIDEA's leases were issued pursuant to an unlawful Leasing Program, it has no heightened interests or protectable rights to the leases that would warrant judicial intervention to cancel them.

While the district court downplayed the practical outcome of its decision — *i.e.*, that the Secretary would need to go to court to seek a declaratory judgment to cancel an improperly issued lease, 1-ER-22 — the Supreme Court has already explained why this is a poor outcome. As the Supreme Court identified, requiring the agency to wait for a judicial determination may result in "a seriously detrimental effect on the prompt and efficient administration of both the public domain and the federal courts." *Boesche*, 373 U.S. at 484. Indeed, doing so would hamstring Interior by limiting its ability to correct leases that do not otherwise comply with the law, while otherwise needing to administer the Leasing Program as directed by Congress. As the Supreme Court explained, the Secretary's power to cancel leases because of agency pre-leasing legal errors protects the public interest and results in the better administration of public lands. *Id*. at 483–85; *see also* 3-ER-381 (recognizing the benefit to all parties of a prompt final decision and

28

explaining how a final decision benefits Interior's administration of the Leasing Program).

Finally, nothing in the regulatory history indicates that Interior or BLM would have understood this regulation as limiting the Secretary's inherent authority. *See generally* Procedures for Leasing of Oil and Gas in the National Petroleum Reserve; Alaska, 46 Fed. Reg. 55,494, 55,494–97 (Nov. 9, 1981); Oil and Gas Leasing—National Petroleum Reserve-Alaska; Proposed Rulemaking Authorizing Oil and Gas Leasing in the National Petroleum Reserve-Alaska, 46 Fed. Reg. 37,725, 37,725–26 (July 22, 1981). The absence of any such discussion in the rulemaking reinforces that there was no reason for Congress to assume the Tax Act's reference to the Reserves Act regulations would withdraw the Secretary's inherent authority. *See Boesche*, 373 U.S. at 476 (explaining that the Secretary's inherent authority exists unless withdrawn by statute); *see also Cruz*, 910 F.3d at 1269 (explaining Congress is presumed to know the law, including judicial precedent, when enacting legislation).

In short, the proper interpretation based on the regulatory text, context, and rulemaking history is that the regulation only applies to post-leasing events for validly issued leases. Subsection (a) applies when the lessee of a nonproducing lease without known valuable deposits of oil or gas is out of compliance with the law, while subsection (b) applies for otherwise validly issued leases that are

29

producing or have known valuable deposits of oil or gas. But the regulation simply does not apply to improperly issued leases where the agency determines that cancellation is necessary to correct its own pre-leasing legal errors. Instead, in that instance, the Secretary's long-recognized inherent authority allows the Secretary to cancel improperly issued leases to address pre-leasing legal errors. Otherwise, the agency would be forced to administer unlawful leases that never should have been issued in the first place.

\*\*\*

Based on the long-standing recognition of the Secretary's inherent authority to correct legal errors, *Cameron*, 252 U.S. at 460–61, Congress' broad delegation of authority to the Secretary to manage public lands, 43 U.S.C. § 2, the lack of any language in the Tax Act or Reserves Act withdrawing the Secretary's authority, and the Supreme Court's conclusion in *Boesche* that a nearly identical provision in the Mineral Leasing Act did not withdraw the Secretary's inherent authority to cancel leases to correct pre-leasing legal errors, 373 U.S. 472, Congress had no reason to believe that referencing the Reserves Act regulations would withdraw that inherent authority when it enacted the Tax Act. The district court's contrary conclusion is incorrect.

30

CONCLUSION

For the reasons explained above, this Court should reverse the district court's decision and judgment and reinstate the Cancellation Decision.

Respectfully submitted this 1st day of December, 2025.

s/ Brook Brisson
Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
TRUSTEES FOR ALASKA

*Counsel for Appellants Gwich'in
Steering Committee, et al.*

s/ Karimah Schoenhut (consent)
Karimah Schoenhut
SIERRA CLUB ENVIRONMENTAL LAW
PROGRAM

*Counsel for Appellant Sierra Club*

s/ Megan Condon (consent)
Megan R. Condon
Mitchell H. Forbes
NATIVE AMERICAN RIGHTS FUND

*Lead Counsel for Intervenor-Appellants
Native Village of Venetie
Tribal Government, Arctic Village Council,
and Venetie Village Council*

s/ Peter Van Tuyn (consent)
Peter H. Van Tuyn
Karen E. Schmidt
BESSENYEY & VAN TUYN, LLC

31

*Co-Counsel for Intervenor-Appellants
Native Village of Venetie
Tribal Government, Arctic Village Council,
and Venetie Village Council*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that: This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,526 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016 Times New Roman 14-point font.

s/ Bridget Psarianos
Bridget Psarianos